[This opinion has been published in *Ohio Official Reports* at 79 Ohio St.3d 314.]

NACCO INDUSTRIES, INC., APPELLANT, *v*. TRACY, TAX COMMR., APPELLEE.

[Cite as *NACCO Industries, Inc. v. Tracy*, 1997-Ohio-368.]

*Taxation—Corporation franchise tax—Gain from the sale of a United States Treasury Bond not exempt from Ohio franchise tax—Section 3124, Title 31, U.S.Code, construed.*

(No. 96-1535—Submitted May 6, 1997—Decided August 6, 1997.)

APPEAL from the Board of Tax Appeals, No. 95-K-1210.

———————————

{¶ 1} In 1982, NACCO Industries, Inc. ("NACCO") purchased, for $6,100,003, a fifteen-year U.S. Treasury Bond in the principal amount of $8,000,000. Seven years later, NACCO sold the bond for $7,694,071, of which $126,575 represented accrued, but unpaid, interest. NACCO did not include its $1,467,493 gain from the sale of the bond in the calculation of its 1990 Ohio franchise tax.

{¶ 2} NACCO objected to the inclusion of the gain on the basis that the Ohio franchise tax impermissibly discriminated against federal obligations because it exempted gains only from the sale of Ohio public obligations. The Ohio Department of Taxation disagreed, included the $1,467,493 gain in NACCO's net income, and increased the assessment in the amount of $116,202. Upon NACCO's petition for reassessment, the Tax Commissioner affirmed the $116,202 assessment plus $37,343 in interest. The Board of Tax Appeals affirmed the final determination of the Tax Commissioner.

{¶ 3} This cause is now before the court upon an appeal as of right.

———————————

*Jones, Day, Reavis & Pogue* and *Charles M. Steines,* for appellant.

*Betty D. Montgomery*, Attorney General, and *Richard C. Farrin*, Assistant Attorney General, for appellee.

_____

**COOK, J.**

**{¶ 4}** Ohio corporations calculate their franchise tax on both a net worth basis and a net income basis and pay whichever produces the greater tax. R.C. 5733.06. In this case, the relevant calculation is net income. The initial base for the net income tax is federal taxable income before net operating loss and special deductions. R.C. 5733.04(I). From that figure, Ohio corporations are permitted to "[a]dd any loss or deduct any gain resulting from the sale, exchange, or other disposition of public obligations to the extent included in federal taxable income." R.C. 5733.04(I)(6). For purposes of R.C. 5733.04(I)(6), a "public obligation" is defined as a "public security." R.C. 5733.04(I)(5), 5709.76(D)(5). A "public security," in turn, is defined as "bonds, notes, certificates of indebtedness, commercial paper, and other instruments in writing issued by a *state or a subdivision*." (Emphasis added.) R.C. 5709.76(D)(6).

**{¶ 5}** The effect of these definitions is that gain from the sale of an Ohio obligation is exempt from the Ohio franchise tax,[1] while gain from the sale of a federal obligation is not. We decide here whether this taxing scheme violates Section 3124, Title 31, U.S.Code, or is unconstitutional under the doctrine of intergovernmental immunity as embodied in the Supremacy Clause of the United States Constitution. We conclude that Ohio's corporate franchise tax scheme violates neither the statute nor the constitutional doctrine.

_____

1. Notably, this exemption from state taxation for state obligations is necessary to comply with the Ohio Constitution. Section 2k(D)(4), Article VIII of the Ohio Constitution exempts from taxation the interest and other income, *including profits from sales,* from bonds issued for the purpose of financing or assisting in the financing of the cost of public infrastructure capital improvements of municipal corporations, counties, townships and other governmental entities.

{¶ 6} With the famous declaration that "the power to tax involves the power to destroy," *McCulloch v. Maryland* (1819), 17 U.S. (4 Wheat.) 316, 431, 4 L.Ed. 579, 607, Chief Justice John Marshall announced the doctrine of federal immunity from state taxation. In *McCulloch*, the court considered Maryland's imposition of a tax on notes issued by any bank established without its authority. The only bank falling into that category was the Bank of the United States. Chief Justice Marshall explained that the federal government "though limited in its powers, is supreme within its sphere of action." *Id.* at 405, 4 L.Ed. at 601. Although both sovereigns could impose taxes, the court held that a state does not have authority to tax an instrument employed by the federal government in the execution of its power. *Id.* at 432, 4 L.Ed. at 608.

{¶ 7} From *McCulloch* evolved the doctrine of intergovernmental tax immunity. In *Metcalf & Eddy v. Mitchell* (1926), 269 U.S. 514, 521, 46 S.Ct. 172, 173-174, 70 L.Ed. 384, 391, the court explained that "the very nature of our constitutional system of dual sovereign governments is such as impliedly to prohibit the federal government from taxing the instrumentalities of state government, and in a similar manner to limit the power of the states to tax the instrumentalities of the federal government."

{¶ 8} In its early development, the doctrine of intergovernmental immunity was construed to insulate not only direct government functions from taxation, but also derivative transactions relating to the performance of governmental functions. 2 Rotunda & Nowak, Treatise on Constitutional Law (2 Ed.1992) 300, Section 13.9. Ultimately, the court expanded the doctrine to prohibit both a state income tax on federal employees and a federal income tax on state employees. *Dobbins v. Erie Cty. Commrs*. (1842), 41 U.S. (16 Pet.) 435, 10 L.Ed. 1022; *The Collector v. Day* (1870), 78 U.S. (11 Wall.) 113, 20 L.Ed. 122.

{¶ 9} In modern times, however, the Supreme Court has adopted "a functional approach to claims of intergovernmental immunity, accommodating of

the full range of each sovereign's legislative authority and respectful of the primary role of Congress in resolving conflicts between the National and State governments." *North Dakota v. United States* (1990), 495 U.S. 423, 435, 110 S.Ct. 1986, 1994, 109 L.Ed.2d 420, 433. Abandoning its early beginnings, the court apparently has eroded the doctrine to the following: "So long as the tax is not directly laid on the Federal Government, it is valid if nondiscriminatory * * * or until Congress declares otherwise." *United States v. Fresno Cty.* (1977), 429 U.S. 452, 460, 97 S.Ct. 699, 704, 50 L.Ed.2d 683, 691.

{¶ 10} By enacting Section 3124, Title 31, U.S.Code ("Section 3124"), Congress has "declared otherwise" on the subject of immunity from state taxation for federal obligations. Because the statutory immunity codified at Section 3124(a) is principally a restatement of the constitutional rule, *Rockford Life Ins. Co. v. Illinois Dept. of Revenue* (1987), 482 U.S. 182, 187-188, 107 S.Ct. 2312, 2315, 96 L.Ed.2d 152, 159, we first view the case at bar under the statutory immunity and then consider whether the constitutional doctrine of intergovernmental immunity requires a broader exemption.

{¶ 11} Section 3124 states, in part:

"(a) Stocks and obligations of the United States Government are exempt from taxation by a State or political subdivision of a State. The exemption applies to each form of taxation that would require the obligation, the interest on the obligation, or both, to be considered in computing a tax, except — (1) a nondiscriminatory franchise tax or another nonproperty tax instead of a franchise tax, imposed on a corporation * * *."

{¶ 12} Under this section, the scope of the immunity from state taxation granted by Congress extends only to federal obligations and the interest on such obligations. By its terms, the immunity expressed in Section 3124(a) does not extend to gains from the sale of federal obligations. In contrast, Section 3124(b), Title 31, U.S.Code, regarding federal taxation of federal obligations, incorporates

the phrase "tax treatment of gain and loss from the disposition of those [federal] obligations." Congress is generally presumed to act intentionally and purposely when it includes particular language in one section of a statute but omits it in another. *Chicago v. Environmental Defense Fund* (1994), 511 U.S. 328, 338, 114 S.Ct. 1588, 1593, 128 L.Ed.2d 302, 311. Had Congress intended Section 3124(a) immunity to extend to gains from the sale of federal obligations, it would have expressed that intent in the statute. See *California State Bd. of Equalization v. Sierra Summit, Inc.* (1989), 490 U.S. 844, 854, 109 S.Ct. 2228, 2235, 104 L.Ed.2d 910, 920.

{¶ 13} Moreover, in *Nebraska Dept. of Revenue v. Loewenstein* (1994), 513 U.S. 123, 115 S.Ct. 557, 130 L.Ed.2d 470, the court upheld a state tax upon interest earned from repurchase agreements involving federal securities under Section 3124. Under these repurchase ("repo") agreements, the owner of the securities agreed to sell and repurchase the securities at a fixed increased price. The original seller retained the interest earned by the securities during the term of the repo agreement. The state exempted from tax the interest paid by the federal government on the federal obligations, but assessed an income tax against the interest paid as a result of the repurchase agreements.

{¶ 14} In upholding the state tax, the court found the dispositive question to be whether the interest at issue was earned on the obligations of the United States government. For purposes of Section 3124, the court concluded, the interest was not attributable to redemption of the securities or payment by the United States government. Rather, the interest was income earned as interest on loans to *private parties*. Thus, the court concluded that the income being taxed by the state was not interest from the federal securities and Section 3124 did not prohibit the state from taxing the income.

{¶ 15} We similarly find that the dispositive question in this case is whether the income at issue was earned on the obligations of the United States. The income

at issue here is not attributable to redemption of the obligations or payment by the United States government. Rather, the income is attributable to a contractual relationship between two private parties. Accordingly, we hold that Section 3124 immunity from state taxation does not extend to Ohio's corporate franchise tax upon the gain from the sales of federal obligations and such a tax is not prohibited by that statute.

{¶ 16} We turn now to consider whether the constitutional doctrine of intergovernmental immunity requires any broader exemption than the statute. Before we proceed, however, we are mindful of the Supreme Court's caveat that a "court must proceed carefully when asked to recognize an exemption from state taxation that Congress has not clearly established. We do well to remember the concluding words in *Smith [v. Davis* (1944), 323 U.S. 111, 119, 65 S.Ct. 157, 161, 89 L.Ed. 107, 113], which although spoken in reference to the statute, are relevant to our role in applying the constitutional doctrine as well: 'All of these related statutes are a clear indication of an intent to immunize from state taxation only the interest-bearing obligations of the United States which are needed to secure credit to carry on the necessary functions of government. That intent, which is largely codified in § 3701, should not be expanded or modified in any degree by the judiciary.'" *Rockford Life Ins. Co.*, 482 U.S. at 191, 107 S.Ct. at 2317-2318, 96 L.Ed.2d at 161. "[A]bsent congressional action," the court has emphasized, "the States' power to tax can be denied only under the 'clearest constitutional mandate.'" (Citation omitted.) *United States v. New Mexico* (1982), 455 U.S. 720, 738, 102 S.Ct. 1373, 1384, 71 L.Ed.2d 580, 594.

{¶ 17} In *Rockford Life Ins. Co.*, the court considered whether "Ginnie Maes," financial instruments issued by private financial institutions and guaranteed by the Government National Mortgage Association, were exempt from state taxation by either statutory or constitutional intergovernmental immunity. In considering the constitutional immunity, the court turned to the purpose of the

constitutional doctrine. The doctrine, the court noted, is based on the proposition that "the borrowing power is an essential aspect of the Federal Government's authority and, just as the Supremacy Clause bars the States from directly taxing federal property, it also bars the States from taxing federal obligations in a manner which has an adverse effect on the United States' borrowing ability." *Id.* at 190, 107 S.Ct. at 2317, 96 L.Ed.2d at 160.

{¶ 18} The court considered the lack of a fixed and certain obligation by the United States on Ginnie Maes "far too attenuated" from the doctrine's concern with the borrowing power of the United States to support constitutional immunity. *Id.* The court also considered that none of the proceeds from the sale of Ginnie Maes was received by the federal government or used to finance any federal function. *Id.* at 191, 107 S.Ct. at 2317, 96 L.Ed.2d at 161.

{¶ 19} In *Willcuts v. Bunn* (1931), 282 U.S. 216, 51 S.Ct. 125, 75 L.Ed. 304, the court upheld a federal tax upon gains from the sale of state and municipal obligations after a challenge based upon the doctrine of intergovernmental immunity. There, the court rejected the notion that a prohibition of a tax on the interest payable on state and municipal bonds also prohibited a tax upon the profits derived from a sale of such bonds. *Id.* at 227, 51 S.Ct. at 127, 75 L.Ed. at 308. The court observed that the sale of bonds by their owners "is a transaction distinct from the contracts made by the government in the bonds themselves, and the profits on such sales are in a different category of income from that of the interest payable on the bonds." *Id.* The court further noted that "[t]he tax upon interest is levied upon the return which comes to the owner of the security according to the provisions of the obligation and without any further transaction on his part. The tax falls upon the owner by virtue of the mere fact of ownership, regardless of the use or disposition of the security. The tax upon profits made upon purchases and sales is an excise upon the result of the combination of several factors, including capital investment and, quite generally, some measure of sagacity; the gain may be

regarded as 'the creation of capital, industry and skill.'" (Citation omitted.) *Id.* at 227-228, 51 S.Ct. at 127-128, 75 L.Ed. at 308.

{¶ 20} The court found particularly persuasive the fact that in a "uniform and long-established practice * * * neither the Federal Government nor the States have found a tax on the profits of the sales of their securities to be a burden on their power to borrow money. So far as we are advised, the Federal Government has not at any time deemed it to be necessary to exempt from taxation the profits realized by owners on the sale of its obligations, with the exception, recently made, of short-term Treasury bills issued on a discount basis and payable without interest." *Id.* at 232, 51 S.Ct. at 129, 75 L.Ed. at 310.

{¶ 21} The *Willcuts* court additionally observed that "it may be doubted whether the prospect on the part of the ordinary investor of obtaining profit on the resale of such obligations is so important an element in inducing their acquisition that a federal tax laid on such profits, in common with profits derived from the sales of other property, constitutes any substantial interference with the functions of state governments. While the tax is laid on gains, there is also a deduction for losses on sales, and whether investors in such securities would consider it an advantage if both provisions were eliminated is a matter of mere speculation. * * * [B]efore we can restrict their application upon the ground of a burden cast upon the State's borrowing power, where the state tax is not laid upon contracts made by the State in the exercise of that power, or upon the amounts payable thereunder, but is laid upon the result of distinct transactions by private owners, it must clearly appear that a substantial burden upon the borrowing power of the State would actually be imposed. But we have nothing but assertion and conjecture." 282 U.S. at 231, 51 S.Ct. at 129, 75 L.Ed. at 310.

{¶ 22} From these precedents, it is apparent that the limits of the constitutional doctrine do not extend to a state tax upon gains from the proceeds of a contract between two private parties where there is no demonstrable burden on

8

the federal borrowing power.  The nexus between the federal government and the exchange of a federal obligation among private parties is "far too attenuated" from the doctrine's concern with the effect of the tax upon the borrowing power of the United States to support constitutional immunity.  *Rockford Life Ins. Co.,* 482 U.S. at 190, 107 S.Ct. at 2317, 96 L.Ed.2d at 160.

{¶ 23} Ohio taxes the proceeds from a transaction between two private parties, a transaction distinct from that of the interest payable on the bonds or the amount payable on the bond itself.  The profits from the transaction are realized entirely by the owner of the obligation.  None of the proceeds from the sale of the obligations was received by the federal government or used to finance any federal function.  We have no evidence clearly establishing that a substantial burden on the federal government's borrowing power would actually be imposed.

{¶ 24} Section 3124 is an indication of an intent to immunize only the federal obligation or the interest on the obligation from state taxation.  Until Congress, in its primary role of resolving conflicts between the national and state governments, expressly resolves this conflict to the contrary, we decline to extend the constitutional limits of the immunity doctrine any further than that provided by Section 3124.  As a result, we find that neither the statutory nor the constitutional intergovernmental immunity doctrine prohibits Ohio's corporate franchise tax on the gains from the sale of federal obligations.

{¶ 25} NACCO argues that our inquiry cannot end here.  NACCO contends that under the constitutional doctrine of intergovernmental immunity, any state tax that discriminates against those who deal with the federal government is invalid. We note, however, that under the modern doctrine of intergovernmental immunity, "[s]o long as the tax is not directly laid on the Federal Government, it is valid if nondiscriminatory * * * *or* until Congress declares otherwise." (Emphasis added.) *Fresno Cty.,* 429 U.S. at 460, 97 S.Ct. at 704, 50 L.Ed.2d at 691.  Since we have determined that Congress has declared otherwise, and we have declined to expand

the limits of that immunity further, Ohio's franchise tax is valid, regardless of whether it is discriminatory.

{¶ 26} Even assuming that we must consider whether the tax is discriminatory, we would nevertheless uphold Ohio's corporate franchise tax. A state tax impermissibly discriminates against federal obligations where it imposes a greater burden on holders of federal property than it does on holders of similar state property. *Id.* The nondiscrimination rule, however, remains rooted in the principle that the state may not obstruct the activities of the federal government. *North Dakota*, 495 U.S. at 437-438, 110 S.Ct. at 1996, 109 L.Ed.2d at 435. With this principle in mind, we find persuasive the Tax Commissioner's argument that in order to establish that the Ohio franchise tax discriminates against federal obligations, NACCO must demonstrate that any difference in treatment between state and federal obligations affects or impedes a function of the federal government; in this case, the marketability of federal obligations. To this end, NACCO's expert testified that in his opinion, the exclusion of gain from the sale of state obligations but not federal obligations would place federal obligations at a disadvantage in the market.

{¶ 27} At first glance, this argument appears to support NACCO. In analyzing the constitutionality of a state law, however, it is inappropriate for a court to look to the most narrow provision addressing the issue. *North Dakota*, 495 U.S. at 438, 110 S.Ct. at 1996, 109 L.Ed.2d at 435. Rather, a determination of whether a tax is discriminatory requires an examination of the state's whole tax structure. *Washington v. United States* (1983), 460 U.S. 536, 542, 103 S.Ct. 1344, 1348, 75 L.Ed.2d 264, 271. Accordingly, we consider that in addition to requiring corporations to "deduct any gain" on the sale of a state obligation, R.C. 5733.04(I)(6) also requires corporations to "add any loss" on the sale of a state obligation in calculating its net income basis.

10

**{¶ 28}** NACCO's expert testified that the add back of losses from the sale of state obligations but not federal obligations would place federal obligations at a market advantage. However, NACCO's expert could not express an opinion on the relative marketability of the obligations when accounting for both gains and losses from the sale of federal obligations but not on state obligations in the calculation of net income basis. More than mere conjecture or speculation is required to establish that a tax is unconstitutional. *Rockford Life Ins. Co.,* 482 U.S. at 190, 107 S.Ct. at 2317, 96 L.Ed.2d at 160, fn. 10.

**{¶ 29}** NACCO cites *Memphis Bank & Trust Co. v. Garner* (1983), 459 U.S. 392, 103 S.Ct. 692, 74 L.Ed.2d 562, as support for the argument that Ohio's tax discriminates against federal obligations. In *Memphis Bank*, the court found a Tennessee state tax on interest earnings from federal obligations but not on interest earnings from state obligations violated Section 3124. We find this case distinguishable. In *Memphis Bank*, the tax upon the interest of a federal obligation fell within the scope of Section 3124. Thus, Congress already made the determination that a state tax on the interest of federal obligations would substantially affect a function of government. Here, however, the tax on the gain from the sale of federal obligations does not fall within the scope of Section 3124 and NACCO has not otherwise established that the state tax at issue affects a function of government.

**{¶ 30}** We also consider that a state tax is invalid only if it discriminates against the federal government or *those with whom it deals*. *Id.* at 397, 103 S.Ct. at 696, 74 L.Ed.2d at 567. Here, the transaction subject to the tax does not arise directly from the relationship between the taxpayer and the federal government. Rather, the transaction subject to the tax arises from a contractual relationship between two private parties. We find this relationship to the federal government too attenuated to invalidate the Ohio franchise tax. Accordingly, we find that

NACCO has failed to establish that the franchise tax discriminates against the federal government or those with whom it deals.

{¶ 31} Because we find that Ohio's corporate franchise tax violates neither the statutory intergovernmental immunity nor constitutional intergovernmental immunity, we affirm the decision of the Board of Tax Appeals.

*Decision affirmed.*

MOYER, C.J., DOUGLAS, F.E. SWEENEY, PFEIFER and LUNDBERG STRATTON, JJ., concur.

RESNICK, J., concurs in judgment only.

_____